# IN THE COURT OF APPEALS OF IOWA

No. 21-0208
Filed September 1, 2021

**ADAM J. WINKOWITSCH,**
    Plaintiff-Appellee,

**vs.**

**CHELSEA A. QUINN,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Marshall County, Bethany J. Currie, Judge.

Chelsea Quinn appeals from an order modifying the provisions of her and Adam Winkowitsch's decree of paternity, custody, visitation, and support. **AFFIRMED.**

Jason S. Rieper of Rieper Law, P.C., Des Moines, for appellant.

Laura A. Eilers of Peglow, O'Hare & See, P.L.C., Marshalltown, for appellee.

Considered by Bower, C.J., and Vaitheswaran and Schumacher, JJ.

**BOWER, Chief Judge.**

Chelsea Quinn and Adam Winkowitsch had a relationship that ended before the birth of their child M.A.Q.-W. in January 2019.  They entered into a stipulation adopted by the district court in its decree of paternity, custody, visitation, and support, which was filed on March 25, 2019.  Under the decree, the parties had joint legal custody and shared physical care.

On April 15, 2020, Chelsea filed an application to modify the decree, asserting a substantial change in circumstances warranted the court placing the child in Chelsea's physical care and modifying the child-support obligation pursuant to guidelines.  Adam counterclaimed, asking for the child to be placed in his physical care.

The competing modification applications were tried on February 3 and 4, 2021.  On February 10, the court filed a twenty-four page ruling modifying the decree to place the child in Adam's physical care, setting visitation, and setting child support pursuant to the guidelines.  Chelsea now appeals, contending that as the historical primary caregiver, the child's best interests would be served by placing the child in her physical care.

This case was tried in equity and therefore our review is de novo.  Iowa R. App. R. 6.907.  Because the district court observes the parties and witnesses, we give weight to its fact and credibility findings, but we are not bound to them.  Iowa R. App. P. 6.904(3)(g); *see In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018).  Our first and governing consideration is the best interests of the child.  Iowa R. App. P. 6.904(3)(o).

"Courts are empowered to modify the custodial terms of a paternity decree only when there has been a substantial change in circumstances since the time of the decree, not contemplated by the court when the decree was entered, which was more or less permanent, and relates to the welfare of the child." *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002).

Initially, we observe each parent is a capable and suitable custodian and obviously loves M.A.Q.-W. Each parent is raising a sibling of M.A.Q.-W. Chelsea has a child older than M.A.Q.-W., Adam has a younger child. M.A.Q.-W. is bonded with both siblings. Any change in physical care will reduce the time M.A.Q.-W. resides with one of the siblings.

There have been changes in circumstances warranting modification of the shared care provided in the paternity decree. First, the parties now live about seventy-five miles apart. Chelsea had lived in Conrad, Iowa, approximately thirty miles northeast of Adam's home in State Center. Adam is required to live in Marshall County due to his employment as a deputy sheriff. When he and his fiancée purchased a new home, they moved to Rhodes, Iowa, about thirty-five miles from Conrad. Chelsea works in Des Moines. When her employer required her to work from the office every day rather than two days per week, Chelsea moved to Winterset. Continuing shared care is no longer feasible.

An additional change of circumstances is the parties have failed to communicate effectively. We observe—as did the trial court—both parents have behaved very poorly.[1] We quote the following from the modification ruling:

---

[1] In a footnote, the trial court noted with respect to the parties' behavior:

Each party has been able to exercise his or her parenting time equally since M.A.Q.-W. turned one year old. However, they both appear to have dug into their respective positions and boxed the other party out. Adam and Chelsea do not communicate effectively. They follow the court-ordered schedule without exception because neither one trusts the other to give them any make-up time if they accommodate the other party's request, after an incident when Chelsea asked to have M.A.Q.-W. during Adam's time for family pictures and then refused to allow him to make up the voluntarily-missed time afterward. Each party contends that he or she would encourage a good relationship between the other party and the child if awarded primary care. Each party's testimony on this point is directly contradicted by how they have treated the other during the past two years. Neither parent has shown he or she is the superior parent. Rather, the court will have to select the less inferior parent to care for M.A.Q.-W. and hope that parent will improve his or her attitude toward the other.

. . . .

The major roadblock on both sides is communication. Because of the lack of effective, civil communication and the very disrespectful tone in the text messages and e-mails (and in-person communications) between the parties, the court is concerned that the child will suffer. He is young enough now that he has not been aware of the tension between the parties, but all too soon he will understand the parties' animosity toward one another. The court worries that either parent would not do enough to support a non-custodial parent's relationship with M.A.Q.-W. because the parent does not particularly like the other parent. However, the evidence in this case is that Chelsea set this negative tone and Adam was initially willing to work collaboratively with her until she made it clear she did not want Adam's input on any important topics, at which time Adam began to respond in kind.

As was the case in *Melchiori*,

---

At the end of the trial, the court admonished both parties for being disrespectful to each other by saying and texting rude, mean, vile messages to each other, and reminded them they need at least a minimum amount of civility toward each other for the next [sixteen] years. Both parties are equally at fault. Both acknowledged at trial that their words were not artfully chosen and they should not have said what they said. Neither one went so far as to apologize to the other for their hurtful words, but the court will accept their sign of regret when faced with their own words as a starting point to change their interactions and improve their communication.

> The shared custody provisions agreed to by these parties and incorporated into the decree have not evolved as envisioned by either of the parties or the court. Both parents appear to agree joint physical care is not working. Discord between parents that has a disruptive effect on children's lives has been held to be a substantial change of circumstance that warrants a modification of the decree to designate a primary physical caregiver if it appears that the children, by having a primary physical caregiver, will have superior care.

*Id.* at 368.

We need not elaborate further on the underlying facts. Suffice it to say, on our de novo review of the evidence presented, we fully agree with the district court's findings and conclusions. While Chelsea argues she has been the historical primary caregiver, the parties have shared care by agreement. Chelsea has dictated the child's schedule for the most part and purposely misled Adam about the child's scheduled doctor's appointments. We find the child's best interests are served by placing the child in Adam's physical care. We therefore affirm.

**AFFIRMED.**